## COUNTY OF WINDSOR,

### AT THE

## FEBRUARY TERM, 1883.

### PRESENT:

HON. JONATHAN ROSS,
HON. H. HENRY POWERS,
HON. WHEELOCK G. VEAZEY, } ASSISTANT JUDGES.
HON. JOHN W. ROWELL,

---

## MILTON GERRISH *v.* WM. L. BRAGG AND CHARLES HUTCHINSON.

### [IN CHANCERY.]

*Patent Right Note. Estoppel. Consideration. Subrogation.*
*Ignorance of Law, Knowing all the Facts. Mortgage*
*Discharged, When not Reinstated. Put*
*Upon Inquiry.*

1. No one is barred, or estopped, by a judgment, except the parties, or their privies; thus, the orator owning two notes secured by mortgage, given in exchange for one note, the consideration of which was a patent right, sold one and a proportional part of the mortgage to S. S. sought to foreclose the mortgage without making the orator a party, and was defeated. The orator was not *estopped* by the decree.

Gerrish *v.* Bragg.

2. The presumption is that a note given for a patent right has a legal consideration, where there is no evidence either that the patent was valuable or that it was worthless. The purchaser of such a note before due is not put upon inquiry.
3. The question, whether a defendant in a foreclosure suit may be subrogated to the rights of a prior mortgagee, may be raised by *answer*. He is not compelled to resort to a *cross-bill*.
4. Doctrine of subrogation and its application stated: cannot be invoked when inequitable to do so; or, if unreasonable de'ay; or, if the rights of others have intervened; or, where no misapprehension of facts; thus, a prior mortgagee, *knowing all the facts*, but supp^sing that a certain decree in chancery was decisive that the orator's mortgage was void, because the note which it secured was given for a patent right, and said decree had established the invalidity of another note given to the orator at the same time and really for the same patent,—discharged his old mortgage, and took a new one subsequent to the orators; the defendant, having had two opportunities in court to ask to be subrogated to the rights of the prior mortgagee, but neglected to do so; the defendant in fact, having paid the mortgage debt, *not to protect his interest in the mortgaged premises, but his interest in certain personal property on the premises*, having, in some arrangement ab)ut it which had been attached, obligated himself to p)y the debt, and then took his mortgage. *Held*, that the old mortgage could not be reinstated; that the defendant was not entitled to be subrogated* to the rights of the first mortgagee.

PETITION in common form to foreclose a mortgage. Heard on petition, answer, replication, and the report of a special master, May Term, 1881. TAFT, Chancellor, decreed a foreclosure. September 8th, 1851, Elisha G. Culver purchased of John Porter a farm in Hartford, and executed a mortgage thereon to secure the purchase price, $2931.86. In May, 1871, C. T. Smith and F. A. Hatch sold to said Culver a patent right for $2400, for which he gave his note to said Hatch. The patent, called Rhodes & Hamlin's Centrifugal Power, was represented as valuable. Culver had an opportunity to inspect one of the machines before purchasing, and did so. Soon after the sale a sample machine was sent him, but it was not like the one first shown him, and was worthless. The master found:

" No evidence was produced before me showing ·that the patent or a machine constructed according to the specifications of the patent, was valuable or worthless, and I do not find on this point either way; and the orator's counsel said nothing about it. ·Immediately after the sale to Culver said Hatch applied to the orator, at his home in Franklin, N. H., to buy the Culver note; and the orator agreed to buy it at a discount, if

---

* See *National Bank* v. *Cushing*, 53 Vt. 325; *Ferre* v. *American Board*, 53 Vt. 175; *Scott* v. *Pachin*, 54 Vt. 265; *Evarts* v. *Hyde*, 51 Vt. 194; *Wilson* v. *Burton*, 52 Vt. 394; *Stevens* v. *Goodenough*, 26 Vt. 676.—REP.

well secured; and the orator immediately applied to Daniel Barnard, an attorney of Franklin, to assist him in raising the money to pay for the Culver note; for Mr. Barnard agreed to help him if the paper was good and well secured, so that the money could be raised on it at the bank. Barnard was to have a share of this discount obtained to pay for assisting the orator in the matter.

" The orator told Barnard at this time that E. B. S. Sanborn, Barnard's law partner, was to go and see about the security; and Barnard wrote a note to said Sanborn cautioning him to see to it that the paper was all right. Smith thereupon sent word to Culver to meet him at Hartford, Vt.; and on the 31st day of May, 1870, Culver went to S. M. Pingree's office in Hartford, Vt., and there met Hatch and Smith and S. M. Pingree, and at request of Hatch took up the $2400 note he had given and gave to Hatch in place of it another note for $2400, payable in one year from date to Milton Gerrish (the orator) or order, and also gave a mortgage on his said farm to secure the same. This new note and mortgage were given at request of Hatch and Smith, to enable them to raise money on the note, as they said. It was finally agreed that the papers should be left with S. M. Pingree, who was acting as attorney for Hatch and Smith, and that Culver should meet Hatch and Pingree and an attorney to be sent by the orator, at Woodstock, and finish the matter there.

" There was no evidence produced that showed that the orator ever authorized Hatch and Smith to take this $2400 note and mortgage payable to him, or that he knew that they had so done or that he ever accepted the same.

" June 3d, 1870, as agreed, Culver went to Woodstock and there met Hatch, S. M. Pingree, E. B. S. Sanborn, and talked the matter over with them and finally gave them in place of the $2400 note, $500 in cash and two notes dated June 3d, 1870, one for $1000 payable six months from date (which is the note in question in this suit), and one for $900, payable three months from date. Both notes were written payable to F. A. Hatch or order. At the same time he gave a mortgage to Hatch on his said farm to secure the two notes, which is the mortgage to foreclose which this suit is brought. This change in amount of notes and time of payment was made at request of Culver, as was also the payment of the $500, he preferring to pay the $500 to having his wife sign the mortgage. The $500 paid by Culver was received by Hatch. The only consideration Culver received for the $500 in cash and the $1900 in notes was the patent right called Rhodes & Hamlin's Centrifugal Power.

" E. B. S. Sanborn came to Woodstock to see if the security which Culver should give was ample, and if it was, to close the trade with Hatch for Gerrish. He acted in what he did in the interest of Gerrish, and as his attorney, though his services and expenses were paid by Hatch, that being part of the bargain between the orator and Hatch. The orator is a farmer in a small way, a wool buyer and speculator, and buys and sells some notes. The orator knew before he purchased the notes that they were given for a patent right, but it did not appear that he knew what patent or its value. Sanborn knew the notes were to be given for a patent right, before they were given by Culver, but it did not appear that he knew what patent or its value.

" As soon as Sanborn satisfied himself that the security offered by Culver was ample, he telegraphed to Franklin, to Barnard or Gerrish, and the money for the purchase of the notes was sent to him by the ora-

Gerrish *v.* Bragg.

tor through Daniel Barnard. Immediately upon the execution and delivery of the two notes and mortgage to Hatch, he endorsed the notes in blank and assigned the mortgage by endorsement on back thereof to the orator. The notes and mortgage were delivered to Sanborn, and the mortgage was left with S. M. Pingree to be recorded. The giving of the notes and mortgage to Hatch and their endorsement and assignment by him to the orator were all one transaction. The orator paid Hatch for the two notes $1725, being a discount of $175 on $1900.

" As soon as the business was done Sanborn returned to Franklin, reaching home on the evening of June 3d, and that evening or the next day gave to the orator the notes, and, acting as agent for the orator, sold the $900 note to his brother, George Sanborn, for $875. Daniel Barnard shared with the orator in the discount on the notes, and on that account endorsed the notes with the orator. The orator in a short time procured the $1000 to be discounted by the Tilton National Bank. August 29, 1871, the orator assigned the mortgage to George Sanborn so far as it covered the $900 note, by an assignment written on the back thereof. Said assignment was never recorded.

" Between August 7, 1870, and May 1, 1871, Culver wrote several times to the orator asking for time on the $1000 note, and promising to pay as soon as he could. He also sent one E. R. Jennings to Franklin to see the orator and ask for time to pay. Culver also went to Franklin, saw Mr. Gerrish, and asked for time. Culver failed to pay the $900 note when due, and George Sanborn brought a suit against him to foreclose the mortgage so far as concerned that note, to the December term, 1870, of the Windsor County Court of Chancery. Culver appeared and made answer, therein alleging that he received no consideration for the note, and setting up the facts substantially as above set forth, and alleging fraud on the part of the orator therein and his assignees. The answer was traversed, and testimony taken by both parties, and at the December Term, 1871, the court *pro forma* and without hearing dismissed the bill, and the orator appealed, and the case was heard in the Supreme Court at its February Term, 1872, held at Woodstock, and the Supreme Court, on hearing, affirmed the decree of the chancellor and remanded the cause to the Court of Chancery with a mandate dismissing the bill, and at the May term, 1872, of Windsor County Court of Chancery a decree was made according to the mandate of the Supreme Court. The orator in this suit was not a party to that suit.

" January 24, 1873, John Porter had a settlement with Culver of all the deal between them, including the amount due on the mortgage on the Culver farm, given him by Culver in 1851, and took a note from Culver for $5596.14, that being the amount of said John Porter's claim, against Culver to that date, and also took from Culver a mortgage of his farm to secure said note. Both the note and mortgage were made running to C. W. Porter, so that said John Porter could take acknowledgment of the mortgage and finish up the business, said John Porter being a justice of the peace, and Culver being hard to settle with. This mortgage covered all the land sold by said John Porter to Culver in 1851, except twenty-five acres bought back by said Porter. This $5596.14 was made up of what was due on the original mortgage to said Porter, and also other deal between said Porter and Culver. Culver's account against Porter was settled by endorsing it on the note. How much of the old mortgage debt was included in the $5596.14 note did not appear. At the time this mortgage was taken to C. W. Porter said John Porter

cancelled his old mortgage and gave up the notes to said Culver. Said John Porter at the time of this transaction with Culver knew of the mortgage to Hatch, and had heard of the suit brought against Culver thereon by George Sanborn, and knew that the $1000 note was still outstanding, but he supposed the decision on the $900 note suit settled the question finally as to the validity of that mortgage, and that it was in reality void, and he supposed that this mortgage given by Culver to C. W. Porter was the only mortgage on the farm after the 1851 mortgage was cancelled. But at the time of the settlement between said John Porter and Culver and the taking of the mortgage to C. W. Porter, I find that neither said John Porter or Culver had any intent or thought of keeping the first mortgage alive by the mortgage to C. W. Porter, or spoke or thought about it at all one way or the other.

"In the fall or summer of 1874, Culver leased his farm to the defendant Bragg, and sold to Bragg all his personal property and put Bragg into possession; Culver leaving said farm with his family and moving on to a place a short distance therefrom. A few days after this transaction said Porter found Culver at work on the farm, and at once attached the personal property thereon which had been sold to Bragg, on a writ in favor of C. W. Porter, against Culver, on the $5596.14 note. Then Culver and John Porter called upon Bragg and prevailed upon him to give C. W. Porter an obligation that he would pay the $5596.14 note if Culver did not, and the suit against Culver was discontinued and the attachment withdrawn. Culver at this time paid Porter $200 to apply on said $5596.14 note, and gave Bragg a mortgage of said farm to secure him for giving the obligation to C. W. Porter. Soon after this Culver left Vermont and removed to Illinois, where he has since resided.

"The $5596.14 note not being paid, C. W. Porter brought suit against the defendant Bragg, to the September term, 1878, obtained a judgment against said Bragg, which said Bragg paid. The mortgage given by Culver to C. W. Porter was discharged after Bragg paid the judgment obtained against him by C. W. Porter. Bragg thereupon brought a suit to foreclose the mortgage given him by Culver, and obtained a decree which became absolute as against Culver. The orator was not made a party to said foreclosure suit by Bragg against Culver.

"In 1875, the $1000 note remaining unpaid, the orator procured a suit to be brought by the Tilton National Bank against the defendant Bragg, C. W. Porter and Culver, in the U. S. Circuit Court for the District of Vermont, to foreclose the mortgage given to Hatch and assigned by him to the orator so far as concerned the $1000 note. This suit was entered in court September 7, 1875. The defendants appeared and made answer. The answers were traversed and testimony taken. The defense set up was substantially the same as in the suit of George Sanborn and Culver, and the decree in that suit was also set up as a defence. After the suit was entered in court the Tilton National Bank obliged the orator to give to it his own note for $1605.50, dated December 25, 1876, being the amount of the Culver note and interest to that date, and let the Culver note lay in the bank as collateral. On hearing in said Circuit Court a decree was made in favor of said bank for $128.92, that being the amount of the Culver note then due to the bank, the balance of said Culver note having been paid to the bank by the orator, as aforesaid. The court held that as the bank received the note while current, and without notice, they could recover the amount actually due on it to the bank. The orator was not a party to that suit.

Gerrish *v.* Bragg.

"John Porter was called as a witness by the defendants and on direct examination was asked the following question: 'What was your understanding and intention at time you discharged your old mortgage and took the new mortgage to your son Charles as bearing upon the security which you had on that real estate ?'

"Objection was seasonably made by the orator, and the answer was received, subject to objection, as follows: 'I had understood there was a mortgage given by Culver for about $1900, and that one of those notes had been sued and decision had been given against the validity of the note and transaction, and Mr. Culver and I were talking up the matter. We arrived at the conclusion that the decision on the other note would be the same, and a new mortgage would be a first lien on the property.'

"Said Porter was also asked on direct examination the following question: 'If you had supposed that the discharge of the old mortgage and taking of the new mortgage would have made the new mortgage subject to the $1900 mortgage, would you have discharged the old mortgage and taken the new one?' Ans. 'I did not suppose that the patent right mortgage, as it was called, would ever amount to anything, or would interfere with my mortgage, or I certainly shouldn't have taken a new mortgage if I had supposed I was coming in with second security by doing so.'"

*Norman Paul,* for the defendant.

The $900 and $1000 notes' being given for the same consideration, at the same time and to the same person, they are but parts of one and the same transaction. The hearing and determination of the whole subject-matter on its merits in the Sanborn suit is conclusive on the question of the validity of said notes and mortgage, and that question cannot be again raised in this suit. Bigelow Estop.; Story Eq. Pl. s. 790; 7 Bac. Abr. p. 619; *Gray* v. *Pingry,* 17 Vt. 419; *Cabot* v. *Washington,* 41 Vt. 168; *Chase* v. *School District,* 47 Vt. 524; *Ehle* v. *Bingham,* 7 Barb. 494; *Adams* v. *Barnes,* 17 Mass. 365; *Outram* v. *Merwood,* 3 East, 346; *R. R. Co.* v. *R. R. Co.* 20 Wall. 137. There was no consideration for the notes. *Cragin* v. *Corbin,* 34 Vt. 326; *Clough* v. *Patrick,* 37 Vt. 421. On the facts found, the John Porter mortgage should be reinstated. 2 Jones Mortg. s. 971; Sheldon Subrogation, ss. 13, 20; *Mower* v. *Granger,* 9 Vt. 242; *Proctor* v. *Thrall,* 22 Vt. 262; *McKenzie* v. *McKenzie,* 52 Vt. 271; *Shaw* v. *Williams,* 87 Ill. 469. The Porter mortgage being a prior lien, and the defendant Bragg having paid it to protect his own estate, is subrogated to all the rights of the first mortgagee. 1 Jones Mort. ss. 876, 885; *Walker* v. *King,* 44 Vt. 601; s. c. 45 Vt. 525; *Barnes* v. *Mott,* 64 N. Y. 397; *Young* v. *Morgan,* 89 Ill. 199.

*J. F. Colby* and *Samuel E. Pingree*, for the orator.

. The defendants are not entitled to be subrogated to the rights of Porter. Sheldon Subrogation, ss. 241–2; *Simonds* v. *Brown*, 18 Vt. 231. The Porter mortgage cannot be reinstated. *Guy* v. *Du Uprey*, 16 Cal. 195; *Dingman* v. *Randall*, 13 Cal. 512; *Banta* v. *Garns*, 1 Sand. 383; *Frazer* v. *Juslee*, 1 Green (N. J. Eq.), 239; 29 Md. 178. Where a mortgage has been discharged and its satisfaction acknowledged, and a new security taken upon the same land for the same debt, the lien of the old mortgage is gone once for all, and the new security must be postponed to such incumbrances as are prior to itself, though junior to the old mortgage. 1 Jones Mort. ss. 874, 882; 11 Gray, 190; *Childs* v. *Stoddard*, 130 Mass. 110; *Kichell* v. *Mudgett*, 37 Mich. 82; *Iowa County* v. *Foster*, 49 Iowa, 676; *Hinchman* v. *Emans*, 1 N. J. Eq. 100.

The opinion of the court was delivered by

Ross, J. I. The decree in the Sanborn suit is not a bar nor an estoppel to the prosecution of this suit by the orator. The orator was not a party to that suit, nor does he stand upon the right of any one who was a party to that suit, and is not bound by its result, although the note then disallowed was secured by the same mortgage now sought to be foreclosed, and Sanborn took his title thereto from the orator. If the orator had been made a party to that suit, he might have produced other and different proof from that adduced by Sanborn, and so have secured a different decree. The U. S. Circuit Court held that the decree in that suit was no bar to the foreclosure of the mortgage on the note in contention, when prosecuted at the expense of the orator against Culver, C. W. Porter and defendant Bragg in the name of the Tilton Bank, which held the note as collateral security for the orator's indebtedness to the bank. There is quite as much ground for holding that the decree in the latter suit bars or estops the defendants, who were all defendants in that suit, or stand on the right of those who were defendants therein, as that the decree in the Sanborn suit bars or estops the orator from the prosecution of this suit. The findings of the master in this suit demonstrate

the justice of the well-established rule, that no one is barred or estopped by a judgment, except those who are parties or privies thereto, and so have had, either by themselves or by those into whose rights they have succeeded, an opportunity to produce testimony, and be heard in the adjudication. It is manifest that either the orator has been able to produce different testimony before the master from that produced before this court in the Sanborn suit, or he has been able to induce the master to consider and weigh the evidence produced in a different light and manner from that in which this court considered it. On the facts found by the master, we think the orator is entitled to a decree of foreclosure of the mortgage for the amount due on the note. The note *prima facie* evidences a consideration therefor. No want of consideration is found by the master. The orator and his agent in the negotiation for the purchase of the note knew the same was given for the purchase of a patent right, but knew not what patent right, nor its character or value. He paid value for the note. The discount was not large, in the condition in which the money market was at the time of the purchase. It is not found that the note was without consideration, nor that it was possessed of any infirmity in the hands of the original payee. The law which secures to inventors the exclusive right to make and vend patented articles recognizes such secured rights as property and valuable. Some such rights are very valuable; others are valueless. Granting that the latter class is much the more numerous, no legal presumption arises that the patent right for which this mortgage note was given was therefore without value. It was the first step in the defence to show that the patent right for which it was given was without value, and for that reason the note was without consideration and void in the hands of the original payee. Without this fact established, there is no ground for inquiring whether the orator took the note under such circumstances that he was put upon inquiry in regard to an infirmity which would avoid the note in the hands of the original payee at its inception. There was no infirmity established of which the orator could learn by inquiry, and therefore he was not bound, under any circumstances, to make inquiry.

II. But the defendant Bragg contends, that if the orator is entitled to a foreclosure of the mortgage against Culver, and those who stand upon rights in the mortgage premises acquired through Culver subsequently to the giving of the mortgage, he has no right to foreclose the same against him, inasmuch as he is entitled by subrogation to stand upon the mortgage given by Culver to John Porter in 1851, which was long before the giving of the mortgate in contention. If this be so, and the defendant Bragg is shown to have such relation to the Porter mortgage that he is entitled to assert it in his favor, we think he may make this defence by way of answer, and is not compelled to resort to a cross bill. It is only necessary for the defendant Bragg to establish that in equity he has a better and prior right to the mortgage premises than the orator to defeat the orator's foreclosure thereof as to him. If he shows himself entitled to the rights which John Porter had under the mortgage of 1851, before the same was discharged upon the record, he can avail himself of this defence in an answer the same as Mr. Porter could have done. He defeats the orator's right to a foreclosure of his mortgage against him when he shows that he stands upon an earlier mortgage which he has the right to assert as against the orator's mortgage. The orator can thereafter move no further as against him in his foreclosure until he has redeemed the defendant's prior mortgage. The doctrine of subrogation is purely an equitable doctrine. It is generally asserted in favor of a surety, or one who to protect his own interest in property has been compelled to pay the debt of another, by putting such person in the place of the original payee of such debt in regard to security upon the property affected. A party is never allowed to invoke it in his aid where it would be inequitable for him to do so. When a party would invoke it to raise a right which he or his predecessor in that right has discharged, he must show that the discharge was through a misapprehension of the facts inducing it; that no rights have intervened to be injuriously affected; that he has been guilty of no delay in its assertion; and that he is so related to that right and the subject-matter thereof that he is entitled to succeed thereto.

These, in general terms, are some of the things he must establish. On consideration of the facts found by the master on this branch of the case, we do not think they place the defendant Bragg in such relation to the John Porter mortgage of 1851 that he is entitled to have that mortgage revived as against the orator. The facts found by the master, in brief, are as follows : The mortgage which the orator is seeking to enforce was given June 3, 1870. At that time there was resting upon the premises the mortgage from Culver to John Porter given in 1851. January, 1873, John Porter and Culver settled all their deal to that date. Porter gave up the old notes and discharged upon the record the mortgage of 1851. He took Culver's note for $5,596.14, secured by a new mortgage of the same premises running to Charles W. Porter. Neither Porter nor Culver had any intention of keeping the old mortgage on foot, though they then knew of the orator's mortgage, and that the note in suit was outstanding. They had heard of the result of the Sanborn suit, and did not regard the orator's note and mortgage of any account. . How much of the old mortgage debt went into the new note of $5,596.14 the master is unable to ascertain. From the amount of the new note as compared with the old one, it is to be presumed that some indebtedness not secured by the old mortgage entered into the new note, which was the balance found due on a settlement of all their deal. In the fall of 1874, Culver leased the mortgaged premises to the defendant Bragg and sold him his personal property. John Porter, who was still the real owner of the new note taken to his son C. W. Porter, caused the personal property to be attached on a writ issued to enforce collection of the new note. He then induced Bragg to become obligated to pay the new note if Culver did not, and released the attachment. Bragg received back the personal property attached, and took a mortgage of the premises from Culver to secure him for assuming the obligation. Culver not having paid the note, C. W. Porter enforced collection thereof against Bragg, and discharged the mortgage given in 1873. Bragg then foreclosed his mortgage against Culver, but did not make the orator a party defendant thereto. In 1875 the Tilton Bank foreclosure suit on the note and mortgage in contention was brought in

the U. S. Circuit Court against Culver, C. W. Porter and defendant Bragg, and resulted in a decree in its favor against them to the extent of the orator's indebtedness to it, for which the note in suit was pledged. Neither C. W. Porter nor Bragg asked to be subrogated to the rights of John Porter under the mortgage of 1851 in that suit. It is to be observed that when Porter attached the personal property which Bragg had purchased of Culver, Bragg had no interest in the mortgaged premises which was imperiled by that attachment. He was under no obligation or compulsion, to protect his interest in the mortgaged premises, to assume the payment of Culver's debt to Porter. Porter claimed that he had not effected a sufficient change of possession of the personal property to protect it from attachment on Culver's debt. It was no fault of the orator's that he had not. If the attachment had prevailed, the debt to Porter would have been reduced by the application of what in law was Culver's property. Rather than risk this result Bragg assumed the payment of Culver's debt and took security therefor on the mortgaged premises. By the record he had constructive notice of the orator's prior mortgage. If what in law was Culver's personal property had been applied to pay the mortgage debt to Porter, all right to revive the former mortgage to the extent of the value of the personal property attached would have been gone. Bragg has by receiving back the property attached, and by the foreclosure of Culver's mortgage to him, received just what he bargained for when he became obligated to pay Culver's debt to Porter. So far as he was thus compensated by Culver for paying his debt to Porter, Bragg has no more right to have the mortgage of 1851 revived against the orator than Culver himself has. When he paid that debt C. W. Porter discharged the mortgage securing the same. The debt to C. W. Porter was not wholly the continuation of the debt of 1851. John Porter had no intention of keeping the mortgage of 1851 alive to secure so much of the old debt as had been merged in the new note. The defendant Bragg by himself or C. W. Porter, to whose right he asks to be allowed to succeed, has had two opportunities to assert the right if he had it, to be subrogated to the security furnished by the mortgage of 1851, and neglected them.

He had such opportunity when he foreclosed his mortgage, and either he or C. W. Porter had it when they were made defendants in the foreclosure suit in favor of the Tilton Bank. In the meantime defendant Bragg has had the use of the mortgage premises, and no interest has been paid on the orator's mortgage note. Culver has left the country. Under these circumstances it would be unheard of, and outside of nearly all the equitable principles that govern the application of the doctrine of subrogation, to allow this defendant, who, as the consideration for assuming the payment of Culver's note to C. W. Porter, has received both Culver's equity of redemption in the mortgage premises and the use of them for eight years as well as the personal property which was liable to be taken as Culver's property in payment or reduction of that debt, not only to revive the discharged mortgage given to C. W. Porter to secure that debt, but also to pick out and ascertain how much of the debt of 1851 went into that debt, and moreover, to revive and stand upon the discharged mortgage of 1851, and that too, when he or C. W. Porter, to whose right he claims to succeed, has had and neglected two prior opportunities to assert this right if it existed, the orator's debt meanwhile constantly becoming larger. If under such circumstances the mortgage of 1851 can be revived, and the defendant Bragg can stand upon it as a defence, when and under what circumstances is the discharge of a mortgage absolute, and beyond the reach of the doctrine of subrogation? If revived, what debt secured thereby has the defendant Bragg paid for which he has not already been repaid? What is the amount of such debt? Who can find out from any facts found by the master? On the facts found this is not a case in which the defendant Bragg can call to his aid the equitable doctrine of subrogation.

The decree of the Court of Chancery is affirmed and cause remanded.